**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GECCMC 2005-C1 PLUMMER
STREET OFFICE LIMITED
PARTNERSHIP, a Delaware limited
partnership,

          *Plaintiff-Appellant,*

          v.

JPMORGAN CHASE BANK, National
Association,

          *Defendant-Appellee,*

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for
Washington Mutual Bank,
      *Defendant-Intervenor-Appellee.*

No. 10-56219

D.C. No.
2:10-cv-01615-
JHN-SH

OPINION

Appeal from the United States District Court
for the Central District of California
Jacqueline H. Nguyen, District Judge, Presiding

Argued and Submitted
November 15, 2011—Pasadena, California

Filed February 1, 2012

Before: Alfred T. Goodwin, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Goodwin

**COUNSEL**

Peder K. Batalden, Horvitz & Levy, Encino, California, for the plaintiff-appellant.

Allyson N. Ho, Morgan, Lewis & Bockius LLP, Houston, Texas, Kathleen MacFarlane Waters, Morgan, Lewis & Bockius LLP, Los Angeles, California, for the defendant-appellee.

Joseph Brooks, Federal Deposit Insurance Corporation, Arlington, Virginia, for the defendant-intervenor-appellee.

---

## OPINION

GOODWIN, Circuit Judge:

This case arises from a landlord-tenant dispute in the wake of the Washington Mutual Bank ("WaMu" or the "Failed Bank") failure in September 2008. Appellant GECCMC ("GE") alleges that JP Morgan Chase Bank ("Chase") failed to pay rent on two properties under lease agreements that Chase assumed after it purchased WaMu's assets and liabilities from the Federal Deposit Insurance Corporation ("FDIC") pursuant to the terms of a written Purchase & Assumption Agreement (the "P&A Agreement" or "Agreement"). GE filed suit against Chase in the Central District of California alleging breach of the lease agreements. The district court granted Chase's motion to dismiss GE's complaint on the grounds that GE lacked standing to enforce or interpret the terms of the P&A Agreement. GE appealed. We granted the FDIC's motion to intervene as defendant-appellee. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.  BACKGROUND

On September 25, 2008, in the largest bank failure in United States history, WaMu closed as a "failed bank" and entered receivership under the direction of the FDIC. Exercising powers granted by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"),[1] the FDIC entered the P&A Agreement with Chase on the same date that WaMu failed. The P&A Agreement memorialized the terms and conditions of the transfer of WaMu's assets and

---

[1]Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989).

liabilities to Chase. As the successor-in-interest to the lessor in two WaMu real estate leases, GE alleges that Chase assumed the two leases under the terms of the P&A Agreement. GE brought suit to enforce the P&A Agreement arguing that Chase is liable for unpaid rent on the leases.

*The Leases*

The current dispute centers on two leases for property in Los Angeles, California. The first lease concerns property at 9401 Oakdale Avenue (the "Oakdale Lease"). The second lease concerns property at 19850 and 19860 Plummer Street (the "Plummer Lease"). The original tenant in the Oakdale Lease was Great Western Savings bank. The original landlord in the Oakdale Lease was Valley Associates I. These original parties to the Oakdale Lease subsequently transferred their interests in the property. WaMu became the tenant as the successor-in-interest of Great Western Savings. After a series of transfers of legal title, GE became landlord of the Oakdale Lease as the successful bidder at a nonjudicial foreclosure sale.

The transfers of interest regarding the Plummer Lease essentially mirror the above sequence with changes to dates and the name of the original landlord. GE is now the landlord of the Plummer Lease, and WaMu is the tenant as the successor-in-interest to Great Western Savings. Neither Chase nor the FDIC disputes GE's status as the current landlord under the leases.

*The P&A Agreement*

On September 25, 2008, federal regulators declared WaMu a failed bank and appointed the FDIC as receiver. Immediately upon WaMu's closing, the FDIC and Chase entered into the P&A Agreement. The FDIC entered the P&A Agreement by the authority granted to it under FIRREA. Congress enacted FIRREA in response to the savings and loan crisis of

the late 1980s. FIRREA provides for the prompt and efficient resolution of the assets and liabilities of failed banks. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 101 (1989). Under FIR-REA, all assets of the failed bank are transferred to the FDIC as receiver. *Id.* § 212 (codified as amended at 12 U.S.C. § 1821(c)). The FDIC has extensive power and discretion to manage the affairs of the failed bank, including the authority to repudiate any contract or lease that it deems burdensome and an impediment to the orderly administration of the failed bank's business. 12 U.S.C. § 1821(e)(1)(B), (C).

Under the P&A Agreement, Chase "purchase[d] substantially all of the assets and assume[d] all deposits and substantially all other liabilities" of WaMu "on the terms and conditions set forth in [the P&A Agreement]." However, Chase's assumption is subject to a caveat in the Agreement expressly limiting the rights of third parties.

In relevant part, the Agreement provides:

> **13.5** *Successors* . . . Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation, and the Assuming Bank [i.e., the FDIC and Chase] any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other person.

Chase and the FDIC argue that section 13.5's express prohibition against granting third party rights precludes GE from

seeking recovery through the P&A Agreement. GE counters that the opening clause, "Except as otherwise specifically provided in this Agreement," creates an exception to this prohibition. In support of its position, GE references section 2.1:

> **2.1  *Liabilities Assumed by Assuming Bank***. Subject to Sections 2.5 and 4.8, the Assuming Bank [i.e., Chase] expressly assumes at Book Value . . . and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1.[2]

GE argues that the Oakdale and Plummer Leases are liabilities that existed on WaMu's books and records at the time the bank failed and therefore have been assumed by Chase under section 2.1. GE cites section 4.6 in further support of its argument. Section 4.6(a) grants Chase a ninety-day option to assume leases for "Bank Premises." Specifically, section 4.6(a) states that "[Chase] shall give notice to the [FDIC] within the option period of its election to accept or not to accept an assignment of any or all leases." GE argues that the leases in question are not for "Bank Premises" as defined by the P&A Agreement. Thus, according to GE, Chase had no option to decline the tenancies.

Section 13.4 of the P&A Agreement also contains a choice of law provision.

> **13.4  *Governing Law***. This agreement and the

---

[2]Section 2.5 pertains to potential claims for borrowed money on WaMu loans. Section 4.8 pertains to agreements for the rendering of services by or to WaMu. These sections, as well as Schedule 2.1, are not relevant to this controversy, and no party relies on them. Therefore, this opinion does not address them.

rights and obligations hereunder shall be governed by and construed in accordance with the federal law of the United States of America and in the absence of controlling federal law, in accordance with the laws of the state in which the main office of the failed bank is located.

(all caps omitted).

*The Proceedings Below and Parallel Proceedings*

On February 18, 2009, Chase notified GE's predecessor-in-interest of its intent not to assume the Plummer lease.[3] The record reflects no evidence that Chase sent formal notice of its intent not to assume the Oakdale lease; however, Chase's counsel subsequently informed GE that Chase had a right under the P&A Agreement to decline assignment of the Oakdale lease because it was not for Bank Premises as defined by the Agreement. By mid-March 2009, Chase vacated both the Plummer and Oakdale premises and ceased paying rent on the leases.

On April 19, 2009, the FDIC informed GE of its decision to disaffirm the Plummer and Oakdale leases under its statutory powers.[4] GE filed an administrative claim with the FDIC challenging the repudiation of the leases. The FDIC denied GE's administrative claim.

---

[3]Chase sent a second letter repeating its position with regard to the Plummer lease on February 23, 2009.

[4]FIRREA gives the FDIC the authority to "disaffirm or repudiate any contract or lease . . . . (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1)(B), (C).

GE filed this action in the Central District of California directly against Chase seeking enforcement of its alleged rights under the P&A Agreement. Subsequently, GE filed suit against the FDIC in the District of Columbia seeking review of its administrative claim. The D.C. district court granted the parties' stipulated motion to stay that action pending resolution of this case.

The district court here applied California law and dismissed GE's claims. The court noted that GE was not a party to the P&A Agreement, and the Agreement's only reference to third-party beneficiary interests was a provision expressly excluding them. The court held that GE, as a non-party to the P&A Agreement, does not have the authority to interpret the Agreement to create privity with Chase regarding the leases. The district court reasoned that GE's attempt to enforce the Agreement impermissibly merged standing with the merits by essentially asking the court to decide whether the leases constituted "Bank Premises" under the P&A Agreement.

GE timely appealed the district court's ruling. We granted the FDIC's motion to intervene in the appeal.

## II.  DISCUSSION

The district court granted Chase's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We affirm on different grounds. *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) ("We may affirm on the basis of any ground supported by the record."). Under federal common law, GE cannot bring suit under the P&A Agreement because GE is not an intended third-party beneficiary of the Agreement.

*A.   Federal common law applies.*

The district court applied California law in finding that GE is not an intended third-party beneficiary to the P&A Agree-

ment. Whether GE can assert such status is central to the determination of this appeal. The outcome is likely the same under California or federal law, but in light of our precedent, federal common law applies.

**[1]** "Federal law governs the interpretation of contracts entered pursuant to federal law where the federal government is a party." *Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004). State law may apply to the interpretation of a federal contract in limited circumstances, "such as when the United States is not a party, or when the direct interests and obligations of the government are not in question." *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005). Neither circumstance is present here. It is undisputed that the FDIC is a federal agency. It is undisputed that the FDIC is a party to the P&A Agreement. FDIC and Chase entered the P&A Agreement pursuant to FIRREA, a federal statute. Moreover, FIRREA implicates uniquely federal concerns in that it governs resolution of the affairs of failed banks. *See* 12 U.S.C. § 1821(d)(2)(G) (authorizing FDIC to transfer assets and liabilities as a receiver of a failed bank); *Ins. Co. of North Am. v. Fed. Express Corp.*, 189 F.3d 914, 926 (9th Cir. 1999) (requiring that federal common law be "[t]ethered to a genuinely identifiable (as opposed to judicially constructed) federal policy." (citation omitted)); Federal Deposit Insurance Reform Act of 2005, Pub. L. No. 109-171, § 2102(a), 120 Stat. 9 (2006) (further consolidating responsibilities for oversight of failed banks in the FDIC).

**[2]** Even more reason exists to apply federal common law if the parties expressly select it as the law governing the contract. *See Cnty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1243 (9th Cir. 2009), *rev'd on other grounds by Astra USA, Inc. v. Santa Clara Cnty.*, 131 S. Ct. 1342 (2011). Section 13.4 of the P&A Agreement clearly provides that "it shall be governed by and construed in accordance with the federal law of the United States of America . . ." and in the absence

of controlling federal law, the law of the state of WaMu's main office, which is Washington state. As discussed below, federal common law squarely addresses the dispositive issue here—whether GE is an intended third-party beneficiary of the P&A Agreement. Therefore, federal common law governs.

### B. GE is not an intended third-party beneficiary under the P&A Agreement.

**[3]** GE is not a party to the P&A Agreement. Consequently, in order to prevail, GE must establish that it has enforceable third-party rights under the P&A Agreement. Under federal common law, this court looks to "general principles for interpreting contracts." *Klamath Water Users Prot. Assoc. v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). One such general principle is that only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract or obtain an appropriate remedy for breach. *See Far West Fed. Bank, S.B. v. Office of Thrift Supervision-Dir.*, 119 F.3d 1358, 1363 (9th Cir. 1997). The fact that a third party may incidentally benefit under the contract does not confer on him the right to sue; instead, the parties must have intended to benefit the third party. *See Klamath*, 204 F.3d at 1211. This distinguishes intended beneficiaries to a contract whose rights are judicially enforceable from incidental beneficiaries whose rights are not judicially enforceable. *See id.* at 1210.

To prove intended beneficiary status, "the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Id.* at 1211. We examine the terms of the contract as a whole, giving them their ordinary meaning. *Id.* at 1210. The contract need not name a beneficiary specifically or individually in the contract; instead, it can specify a "class clearly intended by the parties to benefit from the contract." *Id.* at 1211. Nevertheless, "[d]emonstrating third-party beneficiary status in the

context of a government contract is a comparatively difficult task." *Cnty. of Santa Clara*, 588 F.3d at 1244. "Parties that benefit from a government contract are generally assumed to be incidental beneficiaries," rather than intended beneficiaries, and so "may not enforce the contract absent a clear intent to the contrary." *Id.* (citation omitted).

This "clear intent" hurdle is a high one. It is not satisfied by a contract's recitation of interested constituencies, *Klamath*, 204 F.3d at 1212, "[v]ague, hortatory pronouncements," *id.*, "statement[s] of purpose," *Smith*, 418 F.3d at 1037, "explicit reference to a third party," *Orff v. United States*, 358 F.3d 1137, 1145 (9th Cir. 2004), or even a showing that the contract "operates to the [third parties'] benefit and was entered into with [them] 'in mind,' " *id.* at 1147. Rather, we examine the "precise language of the contract for a 'clear intent' to rebut the presumption that the [third parties] are merely incidental beneficiaries." *Id.* at 1147 n.5; *see also Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003) (explaining that a "more stringent test applies" to government contracts).

**[4]** Section 13.5 of the Agreement expressly disclaims any intent to create third-party beneficiaries while stating that this disclaimer is limited "as otherwise specifically provided in this Agreement." GE argues that the limitation of the disclaimer together with language from section 2.1, which provides that "[Chase] . . . agrees to pay, perform, and discharge, all of the liabilities of [WaMu] which are reflected on the Books and Records of [WaMu] as of Bank Closing," vests GE with enforceable rights under the Agreement. We disagree. The P&A Agreement does not reflect a "clear intent" to confer a benefit on GE. The phrase "[e]xcept as otherwise specifically provided" relied on by GE does not specifically refer to section 2.1, and certainly does not refer to section 2.1 in a clear enough matter to overcome the presumption against third-party beneficiaries. *See Wichita Falls Office Assocs. v. Banc One Corp.*, No. 3:90-CV-1301, Mem. Op. at 19 (N.D.

Tex. Nov. 22, 1993), *aff'd without opinion*, 40 F.3d 384 (5th Cir. 1994). Nor does section 2.1 "specifically provide[ ]" for third-party rights of third-party lessors. A survey of our recent cases addressing third-party beneficiaries in the government contract context confirms this conclusion.

In *Klamath*, *Orff*, and *Smith*, three water rights cases, this court found insufficient evidence to overcome the "clear intent" hurdle. *Klamath* involved disputed claims to water in the Klamath Basin. 204 F.3d at 1209. Local irrigators sought to enforce terms of a contract between the United States and a power company engaged to build and operate a dam within the Basin. *Id.* at 1209-10. Applying federal law, we held that although the contract "operates to the Irrigators benefit" and "was undoubtedly entered into with the Irrigators in mind," the irrigators could not be third-party beneficiaries because such a finding would be inconsistent with the objectives of the contract and "would open the door to all users receiving a benefit from the Project achieving similar status, a result not intended by the Contract." *Id.* at 1212.

*Orff* provides an even starker example of the heightened standard required of third-party beneficiaries to government contracts. In *Orff*, we declined to extend enforceable rights to a group of California farmers, who were not parties to the contract but were nevertheless end users of water brought to their land under a federal allocation project. 358 F.3d at 1141, 1145. We reached this decision despite the fact that the farmers were explicitly referred to in and benefitted by the contract and were clearly "in [the] mind" of the contracting parties. *Id.* at 1145-47. Similarly, in *Smith*, despite at least six provisions in the underlying master and subcontracts that purportedly extended enforceable rights to end users, we declined to find that Arizona landowners were intended third-party beneficiaries to contracts involving a water reclamation project. 418 F.3d at 1036-37. Again, our decision turned on the landowners' failure to show a "clear intent" to benefit them and the difficulty of reconciling third-party beneficiary status with the

express objectives of the contracts. *Id.* at 1037; *cf. Cnty of Santa Clara*, 588 F.3d at 1245-46 (conferring intended third-party beneficiary status where a "specific responsibility" was undertaken by the contracting parties to benefit the third parties in an "unambiguous," "concrete" way).

**[5]** Here, section 13.5's "no third-party beneficiary" clause stacks the deck against GE's claims at the outset. The express objective of the P&A Agreement is to create a contractual framework whereby "substantially all," but not all, of WaMu's assets and liabilities can be transferred by the FDIC to Chase "*on the terms and conditions set forth in this Agreement.*" (Emphasis added). As in *Klamath*, *Orff*, and *Smith*, the Agreement thus memorializes the relationship between contracting parties while keeping "in mind" that other third parties may retain some interest in the subject matter of the transaction. The plain language of section 13.5 establishes enforceable rights as between the contracting parties to the P&A Agreement, the FDIC and Chase—not GE. *See, e.g.*, *Smith*, 418 F.3d at 1036 (a provision indicating that one party to the contract will "abide by the terms of the project subcontracts . . . does nothing to create vested . . . rights in the [parties affected by those subcontracts])."

**[6]** In sum, GE's reliance on section 2.1, in which Chase "expressly assumes . . . all of the liabilities of [WaMu]," does not evince the specificity required to carve out enforceable rights as contemplated by section 13.5. Nor does section 2.1 show the "clear intent" needed to rebut the presumption that GE is merely an incidental beneficiary. *See Orff*, 358 F.3d at 1147 n.5. As an incidental beneficiary, GE cannot seek recovery under the P&A Agreement.

C.   *GE's no third-party beneficiary status adheres to FIRREA's statutory purpose.*

**[7]** FIRREA's statutory framework further supports our conclusion that GE is not an intended third-party beneficiary.

"In determining th[e] central question of the parties' intent [to create enforceable rights in a third party] . . . [w]e also weigh the 'circumstances of the transaction,' which, when a contract is mandated by a federal statute, includes the 'governing statute and its purpose.' " *Cnty. of Santa Clara*, 588 F.3d at 1245 (internal citations omitted).

**[8]** The FDIC entered the P&A Agreement under the authority granted to it by Congress through FIRREA. *See* 12 U.S.C. § 1821(d). One of FIRREA's core purposes is "[t]o provide funds from public and private sources to deal expeditiously with failed depository institutions." *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 101(8) (1989). The FDIC's receivership powers under FIRREA include the ability to transfer or retain any liability of the failed bank as well as to disaffirm or repudiate any lease that the FDIC determines is burdensome. *See* 12 U.S.C. § 1821(d)(2)(G), (e). FIRREA's statutory scheme thus contemplates the FDIC's sweeping authority to manage the affairs of a failed bank to further the purpose of expeditious resolution of the failed bank's affairs. *See McCarthy v. FDIC*, 348 F.3d 1075, 1079 (9th Cir. 2003).

**[9]** Allowing GE to enforce rights under the P&A Agreement would impede FIRREA's mandate to "preserve and conserve the assets and property of [the Failed Bank]," 12 U.S.C. § 1821(d)(2)(B)(iv), by opening the door to suits from any number of third parties who might claim a benefit from the Agreement's terms. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 388 (3d Cir. 1994) ("One of the important goals of FIRREA is to enable the receiver to efficiently determine creditors' claims and preserve assets of the failed institution without being burdened by complex and costly litigation."); *see also Astra USA, Inc.*, 131 S. Ct. at 1349 ("Recognizing the [alleged third-party beneficiary's] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits").

GE's argument that denial of its alleged right to enforce the P&A Agreement would frustrate FIRREA by prejudicing the rights of other important constituencies, such as depositors, is unavailing. It is true that an important purpose of FIRREA is to protect the assets of depositors. However, depositors need not rely on the P&A Agreement for a remedy. FIRREA provides a statutory mechanism for such relief. *See* 12 U.S.C. § 1821(f).[5]

[10] Our precedent balanced against the Congressional imperatives of FIRREA dictate that GE does not have enforceable rights under the P&A Agreement. Therefore, GE's recourse is not a suit against Chase under the P&A Agreement. To the extent GE seeks recovery for its losses, that remedy is best sought in its claim against the FDIC in the D.C. district court. *See id.* § 1821(d) (enumerating appropriate remedies against the FDIC for liabilities claimed against a failed bank).

### III.   CONCLUSION

Because GE is not an intended third-party beneficiary of the P&A Agreement, GE has no enforceable rights under that contract.

**AFFIRMED.**

---

[5]In any event, a depositor attempting to rely on the P&A Agreement for recovery would have a more persuasive argument for intended third-party beneficiary status based on the specific language of the Agreement. *See* P&A Agreement § 2.1 ("including the Assumed Deposits").